MORGAN GUARANTY TRUST CO. OF NEW YORK and Marine Midland Bank of New York

v.

NEW ENGLAND MERCHANTS NATIONAL BANK

v.

TOWN BANK and TRUST COMPANY.

Civ. A. No. 71–1658–T.

United States District Court, D. Massachusetts.

Aug. 26, 1977.

William T. Conlan, Daniel B. Bickford, Ely, Bartlett, Brown & Proctor, Boston, Mass., for plaintiffs.

Franklin Cunningham, Warner & Stackpole, Boston, Mass., for defendant.

Paul F. Markham, Boston, Mass., for Town Bank and Trust Co.

## OPINION

TAURO, District Judge.

This is a third party action brought by the New England Merchants National

Bank (New England) against the Town Bank and Trust Company (Town). The court had diversity jurisdiction over the first party action and now exercises jurisdiction over this third party action pursuant to the doctrine of ancillary jurisdiction.[1] New England seeks indemnity from Town for a $56,750 settlement that it made with the Marine Midland Bank (Marine) and the Morgan Guaranty Trust Company (Morgan). That settlement was based upon the alleged conversion of 16 United States Treasury Bills that were stolen from Morgan and Marine and that were eventually negotiated by New England. This indemnity claim is premised on the fact that the bills were transmitted to New England from Town.

After a bench trial, the court concludes that Town is not liable to New England for the transmittal of the stolen bills.

## I.

A detailed statement of facts is essential to an analysis of this case.

In the late morning of June 20, 1969, Herbert Swartz and Bernard Cohen entered Town Bank in Brookline, Mass., carrying $34,000 in U.S. Treasury Bills.[2] The two men spoke first with Town's Vice President, Raymond Mannos, and then with the Treasurer, Arthur Cassidy, about cashing the bills as soon as possible. Swartz was not a stranger to Town officials. He was a local attorney who had served as counsel to

Town. In addition, he had two accounts there and had borrowed funds on several occasions. Similarly, Cohen was well known at Town as a man of substantial means involved in real estate and as the President of a local bank. He too was a customer of Town. The authenticity of the bills was verified when Cassidy called the Federal Reserve Bank of Boston and the Secret Service. Neither man had previously negotiated treasury bills at Town.

In order to avoid the delay attendant on sale of treasury bills in the ordinary course, Town arranged an immediate loan for Cohen and Swartz which was secured by the bills. A check for $32,480.25 was issued for the net proceeds of a $33,000 loan, and Cohen and Swartz received those proceeds in cash that day.

On July 15, and August 25, 1969, in transactions involving the same format and parties, checks were issued to Swartz and Cohen as proceeds from loans on two treasury bills, each having a face value of $100,000. These transactions are not in dispute.

There ensued a series of ten transactions between Swartz, Cohen and Town during September and early October, 1969, in which the men pledged 15 bills with a face value of over one million dollars, as security for immediate loans from Town.[3] In each transaction, Town transmitted the bills to its correspondent, New England, which in turn sold the bills for Town's account. Af-

1. The first party action involving Morgan Guaranty Trust and Marine Midland Bank was originally filed in state superior court. It was then removed to federal court under 28 U.S.C. § 1441(a) on the grounds that the district court had original jurisdiction over the dispute pursuant to diversity jurisdiction. 28 U.S.C. § 1332. Within two weeks of removal, and within ten (10) days of answering, the defendant filed a third party complaint against the Town Bank and Trust Company. Although diversity is lacking between third party plaintiff and third party defendant, the court has jurisdiction over the third party action under the doctrine of ancillary jurisdiction. *Lorance v. Marion Power Shovel*, 520 F.2d 737 (7th Cir. 1975); 3 Moore's Federal Practice ¶ 14.26, n. 6 and cases cited therein.

2. The court is unpersuaded by the conflicting testimony as to the presence of a third party at the bank that day.

3. The dates of those loans, the face value of the bills pledged, and the amounts of the loans, are as follows:

| | DATE | FACE VALUE | LOAN |
|---|---|---|---|
| 1. | 9/8/69 | $100,000 | $90,000 |
| 2. | 9/9/69 | $120,000 | $108,000 |
| 3. | 9/10/69 | $100,000 | $90,000 |
| 4. | 9/11/69 | $130,000 | $117,000 |
| 5. | 9/15/69 | $100,000 | $90,000 |
| 6. | 9/17/69 | $100,000 | $90,000 |
| 7. | 9/18/69 | $100,000 | $90,000 |
| 8. | 9/22/69 | $100,000 | $90,000 |
| 9. | 9/24/69 | $100,000 | $90,067 |
| 10. | 10/1/69 | $100,000 | $70,000 |

ter delivering the bills to the Federal Reserve, New England credited the proceeds from their sale to Town's account. Town in turn applied those proceeds to pay in full the principal and interest owing on loans to Swartz and Cohen. On each of these ten transactions, and on the August 25th transaction, a $250 service charge was collected by Town, and the balance was credited to the accounts of the two men.

On the morning of October 20, 1969, Town received a $100,000 Treasury Bill from Swartz and Cohen as security for a $35,000 loan. Later that day, after the loan had been made, and its proceeds disbursed, an agent of the FBI visited both Town and New England to inform them that the 15 bills negotiated by Cohen and Swartz in September and early October, not including the one negotiated that day, were securities stolen from two New York banks, Morgan and Marine. At Town, the agent spoke with an unidentified bank official. Town's treasurer, Mr. Cassidy, who had set up the transactions, was away from the office on the 20th, and was not informed of the thefts until the 21st. At New England, the agent spoke directly to Mr. Jones, a trust officer in the Security Clearance Department—the department in charge of handling treasury bill sales. Nevertheless, the final $100,000 bill was transmitted by Town to New England on October 21, 1969.[4] That bill was then sold by New England for Town's account and the proceeds were used to satisfy the $35,000 loan.

A series of lawsuits arose from this complex of transactions. In February of 1971, Morgan and Marine filed a conversion action in this court against Town and three individuals, Herbert Swartz, Bernard Cohen and Marvin Karger, CA 71–334–T. Karger allegedly was responsible for providing Swartz and Cohen with the bills. On July 9, 1971, Morgan gained a partial summary

judgment against Town on the treasury bill that was negotiated on October 20–21. The judgment was satisfied by Town's payment of $61,293.81 to Morgan, the true owner of that bill.[5] Morgan and Marine subsequently settled all of their claims against Town, Swartz, Cohen and Karger.

The case now before this court was filed in August of 1971 in the superior court by Morgan and Marine against New England, based on the conversion of the sixteen treasury bills negotiated in September and October of 1969. That case was removed to this court, and was consolidated with CA 71–334–T. After removal, New England filed a third party complaint against Town, alleging a variety of grounds for indemnity. In September of 1973, after denial of its summary judgment motions, New England began settlement negotiations with Morgan and Marine. Town was informed as to the negotiations, but declined to participate. Thereafter, New England settled with Morgan and Marine for $56,750. Based upon the testimony heard by this court, it appears that New England chose to settle the case for several reasons: 1. New England estimated that it could settle the case for the cost of trying it; 2. New England was eager to avoid the administrative burden resulting from protracted litigation; and 3. New England feared some limited exposure. The settlement amount was not apportioned to any individual transaction.

Currently before the court is the one remaining piece of this legal puzzle—the question of Town's liability to New England in indemnity for New England's settlement with Morgan and Marine. The problem breaks down into two questions. First, is Town liable to New England because of the circumstances under which it transmitted the bills for sale? If so, does that liability extend to reimbursement of New England for its settlement with Morgan and Marine?

4. That bill was sent to New England by means of a transmittal form which did not indicate that Swartz and Cohen had an interest in the security. Prior to this bill, all but one of the disputed transactions was accompanied by a transmittal form that stated Swartz's and Cohen's interest.

5. The settlement sum is roughly equivalent to the balance of proceeds that Town held after having sold the October 20th bill and satisfied the $35,000 loan on that bill.

New England presses three distinct theories of liability: breach of warranties; fraud; and a lack of care in connection with the transactions. It is unnecessary to test each of the eleven transactions against each theory of liability. The ten transactions that occurred in September and early October are circumstantially indistinguishable from each other and are subject to a single analysis. The October 20–21 transaction, however, is distinctive and will therefore require separate consideration in the subsequent legal analysis.

## II.

### A. THIRD PARTY PLAINTIFF'S WARRANTY THEORY

■ New England's warranty theory is based on Mass.Gen.Laws ch. 106, § 8–306(2),[6] which provides that,

A person by transferring a security to a purchaser for value warrants only that

(a) his transfer is effective and rightful; and

(b) the security is genuine and has not been materially altered; and

(c) he knows no fact which might impair the validity of the security.

Under the U.C.C. definitions, the warranties of § 8–306(2) apply to Town as a "person" who transferred a "security" to a "purchaser" for "value". Mass.Gen.Laws ch. 106, §§ 1–201(30), (32), (33), (40), and 8–102.

### 1.

■ New England maintains that Town breached the first warranty of § 8–306(2) in that the transfer was not "rightful." Although there is no simple test for determining the rightfulness of a transfer, fraud, incapacity, duress and lack of authority are examples of circumstances which might render a transfer wrongful. 25 Stickells and Everberg, Massachusetts Practice

§ 8.45. Aside from fraud, none of these would seem to have any relevance to this case. The argument of fraud is rejected as will be developed in the subsequent discussion of third party plaintiff's fraud cause of action. See II. B, *infra*.

One means of examining an allegation of breach of "rightful" and "effective" warranty, is whether the transferor enjoyed the status of a bona fide purchaser (BFP) as to all the bills relevant to this dispute. The significance of BFP status in relation to this first warranty is that Massachusetts law dictates that a BFP acquires a security free of any adverse claim, including a claim that a transfer "was or would be unauthorized or wrongful." Mass.Gen.Laws ch. 106, § 8–301(2).

While New England does not dispute the significance of characterizing Town as a BFP, it does argue that Town did not acquire a BFP status in connection with the disputed transactions. In order to determine whether Town was a BFP, reference must be made to Mass.Gen.Laws ch. 106, § 8–302, which defines a BFP as

a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form . . . .

Under the previously referenced provisions, it is clear that Town was a "purchaser", for "value", Mass.Gen.Laws ch. 106, § 1–201(32), (33), (44), as to all of the disputed transactions, in that Town took the bills as collateral for loans. *Morgan Guaranty Trust v. Third Nat'l Bank*, 400 F.Supp. 383, 389 (D.Mass. 1975) (Freedman, D. J.), *aff'd on other grounds*, 529 F.2d 1141 (1st Cir. 1976). Moreover, there is no question but that Town took delivery of the bills in bearer form.

■ The good faith of Town must be measured under the subjective standard es-

---

**6.** New England's alternative claim of warranties not encompassed within § 8–306(2) is defeated by the exclusive "only" language of that statute.

On the other hand, the court is not persuaded by Town's argument that it should be held only

to the meager warranties of § 8–306(3)—good faith and authority. Town had a perfected security interest in each bill which defeats its claim to those warranties as an intermediary or pledgee. *See First Nat'l Bank v. H. Hentz and Co.*, 498 S.W.2d 478 (Tex.Civ.App.1973).

tablished by Mass.Gen.Laws ch. 106, § 1–201(19), defining "good faith" as "honesty in fact in the conduct or transaction concerned."[7] Accepting this standard, I conclude that Town exercised good faith in its purchase of the 16 treasury bills. The bills were presented by Swartz and Cohen, both of whom were well known to the bank and were considered trustworthy. Nothing on the face of the bills indicated their invalidity. The validity of the June 20 bills had been confirmed by the Federal Reserve Bank. Town received notice that any of the bills were stolen only *after* all 16 had been purchased.[8]

▪ Finally, as to the notice requirement of BFP status, two sections of the U.C.C. are relevant. First, Mass.Gen.Laws ch. 106, § 8–304 specifies three limited circumstances in which a purchaser of a security is automatically charged with notice of an adverse claim.[9] None are present here. Second, Mass.Gen.Laws ch. 106, § 1–201(25) provides that a person has "notice" of a fact, in this case an adverse claim, when

(a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person "knows" or has "knowledge" of a fact when he has actual knowledge of it. . . .

New England strenuously argues that Town was not a BFP because the facts and circumstances known to Town at the time it made the various loans gave it reason to know that there were adverse claims against the treasury bills—conversion

claims arising from the fact that they were stolen. In support of its theory, New England argues that neither Swartz nor Cohen had ever dealt in treasury bills at Town prior to these transactions; that their requests for immediate negotiation of large bills were unusual in Town's experience; and that the frequency and cumulative size of the transactions were unusual. While these facts standing alone, without consideration of mitigating factors (such as Town's familiarity with Swartz and Cohen), might give rise to some suspicions about the activities of Swartz and Cohen, they do not constitute reason to conclude that the bills were stolen.

The court therefore concludes that Town was a BFP at the time it purchased each of the stolen securities. The warranty of effective and rightful transfer was thus satisfied.

*2.*

The second warranty imposed upon Town by § 8–306(2) is that the securities were genuine and not altered. Neither New England nor the evidence suggests a breach of this warranty.

*3.*

▪ The final warranty made by Town was that it knew of no fact which might "impair the validity of the security." The warranty is not of the security's validity. 25 Stickells and Everberg Massachusetts Practice § 8.42. The focus of relevant inquiry is limited, to whether Town, at the time of transmittal, had actual knowledge of facts that might impair the bills' validity.[10] In making this inquiry, it is nec-

---

7. The objective good faith standard imposed upon agents and bailees by Mass.Gen.Laws ch. 106, § 8–318 is not relevant to this litigation because Town is not charged by New England with conversion.

8. Under Massachusetts law, the existence of this subjective good faith does not speak to the question of whether Town engaged in bad faith after the purchase occurred, or whether Town exercised due care consistent with reasonable commercial standards. *Industrial Nat'l Bank v. Leo's Used Car Exch.*, 362 Mass. 797, 291 N.E.2d 603 (1973). Those questions will be addressed subsequently.

9. The circumstances are: 1) where a security has a certain type of endorsement; 2) where bearer securities have unambiguous statements as to the ownership of the security; and 3) in certain instances of fiduciary interest in the security.

10. The term "know", as used in this warranty, means actual knowledge. It is distinct from "notice" which may include having reason to know from established facts and circumstances. Mass.Gen.Laws ch. 106, § 1–201(25).

essary to analyze the first 15 transmittals separately from the last.

The first 15 bills were transmitted between September 9 and October 1 of 1969. The FBI visit to Town did not occur until October 20 of that year. New England tries to build a circumstantial case based upon the same facts that it marshalled in conjunction with the BFP question. Those circumstances, standing alone, only create suspicions as to what kind of business Cohen and Swartz were engaged in, which would have such large cash demands. Furthermore, mitigating factors diminish the strength of an inference that the bills were stolen. From past dealings, Town considered these customers to be reputable, trustworthy individuals. Town verified the validity of the first three bills it received in June. And from June to mid-October, Town negotiated bills from Cohen and Swartz without any adverse consequences. For these reasons the court concludes that Town did not actually know the first 15 bills were stolen.

█ New England makes its most persuasive argument for breach of § 8–306(2)(c) in relation to the transmittal of the last treasury bill on October 20–21. It is clear that *after* that bill was received by Town, an FBI agent informed someone at Town that the previous 15 bills had been stolen. From this added circumstance, New England urges that Town had actual knowledge of facts suggesting that the validity of the last bill was impaired and thus that it had breached its warranty.

While New England's argument does have considerable weight, I conclude that Town did not have, at the time it transmitted the last bill to New England, actual knowledge of facts that would lead it to conclude that the 16th security was stolen. First, it was established that sometime during the 20th of October the FBI told an official at Town that the prior 15 bills that had passed through Town were stolen securities. It was not until several days later that Town was informed that the last bill was also stolen. At best, New England can only argue that Town had actual knowledge that other bills presented by Swartz and Cohen were stolen and that, therefore, Town might conclude that this last bill was also stolen. The evidence established that the FBI information as to the first 15 bills was received by Town at some time on the 20th, and that the 16th bill was passed on to New England sometime on the 21st. In the 15 previous transactions, transmittal occurred on the same day as, or on the next day after the bills were purchased by Town. Cassidy's description of the purchase/loan/transmittal process reveals that the bills moved quickly from Swartz and Cohen, through Town to New England. While we do not know exactly how much time expired between the FBI visit and the transmittal, it cannot have been more than a few banking hours. The FBI agent arrived at Town after the 11th loan had been arranged that morning. It is reasonable to infer, therefore, that he didn't inform any Town official until sometime after midmorning. Furthermore, the transmittal bill must have left Town early on the 21st because it arrived at New England in time to be sold the same day.

The court concludes that these facts are insufficient to sustain New England's burden of showing that Town had actual knowledge of the thefts at the time of the transmittal. Mass.Gen.Laws ch. 106, § 1–201(27) defines the point at which knowledge is effective against an institution for a particular transaction, from

> the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to commu-

nicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information.

Applying this definition, the evidence shows neither that the individual at Town who transmitted the bill was aware of the FBI information, nor that there was any failure of due diligence on Town's part in communicating that information.[11] The fact that the transmittal occurred does not mean that Town failed to maintain "reasonable routines" for communicating significant information to appropriate personnel. A lag of a few hours in the transmission of information within a banking institution, does not constitute a lack of reasonable routines.

Therefore, New England's third warranty argument and its entire § 8–306(2) theory fail.

### B.

The second distinct theory of liability pressed by New England is deceit in connection with the bill negotiated on October 20–21. This theory is predicated on the fact that the transmittal form, that sent the bill from Town to New England, did not disclose Swartz's and Cohen's interest in the bill. New England argues that Town intentionally withheld that material fact and that if New England had been aware of it, the bank would not have dealt with the bill. This omission is allegedly significant because Town had disclosed Cohen's and Swartz's interest on the previous 10 transmittal forms.

New England's deceit argument is defective in several respects. First, the general rule in Massachusetts is that, absent a duty to speak, there can be no liability in deceit for failure to disclose. *Swinton v. Whitinsville Savings Bank,* 311 Mass. 677, 42 N.E.2d 808 (1942). The bill was being

sold for Town's account at New England. Under the circumstances, there was no duty to disclose Swartz's and Cohen's names.

Second, absent said duty, New England seems to suggest that Town's omission is actionable because Swartz's and Cohen's interest in all the other bills had been disclosed. This argument is defeated by the record which reflects that one other transmittal form did not reveal their interest—the form for bill # 941913A.

Finally, although Massachusetts courts hold that "an intentional misrepresentation is not a prerequisite to recovery for deceit," there must at least be a false statement that is susceptible of actual knowledge. *Snyder v. Sperry and Hutchinson Co.,* Mass., 333 N.E.2d 421, 428 (1975). As was previously discussed, Town cannot be charged with actual knowledge of the materiality of its omission, because it did not "know" at the time of the transmittal that the other bills were stolen.

### C.

New England has pleaded a variety of causes of action all relating to Town's failure to exercise due care in connection with the instant transaction: failure to observe commercial standards; negligent misrepresentation; and willful, wanton and reckless conduct. Each of these theories is deserving of only summary comment.

New England theorizes that Town failed to observe reasonable commercial standards in dealing with all 16 treasury bills. A New England Vice President offered expert testimony as to this failure. Without going into the merits of the cause of action, it is sufficient to note that the evidence produced at trial showed that Town had in fact complied with the governing standard. The third party plaintiff produced its own Commercial Loan Manual as evidence of reasonable commercial standards. That manual indicates in pertinent part:

Some corporate bonds and most government obligations are in bearer form, mak-

---

11. The evidence shows that Cassidy, the man in charge of the transactions at Town, was not present at the bank when the FBI appeared.

ing determination of ownership a vital consideration. The borrower and/or pledgor should be very well known and reputable, but even an honest customer may have innocently purchased a lost or stolen bond. The Loan Department, the Trust Securities area or Corporate Services maintains up-to-date listings of stolen securities. The Federal Reserve Bank and other federal agencies also maintain lists of lost and stolen bonds. . . . *Manual at 8.4.*

Whenever securities are being taken as collateral, lending officers should always satisfy themselves as to the authenticity of ownership. It shall be a policy of this Bank that unless the individual pledging the securities is *very well known* to the account officer and the customer's integrity is above question, the lending officer must verify ownership of the securities. . . . (emphasis in original). *Manual at 8.5.*

The evidence establishes Town's compliance with these standards. Cohen and Swartz were "very well known" to Town and their "integrity was above question." Cohen was a customer; a man of substantial means involved in local real estate; and the president of a local bank. Swartz was a local attorney who had represented the bank, had two accounts, and had been a borrower. Nonetheless, Town ran a check with federal authorities on the initial bills, as the Manual suggests. That precaution merely reinforced Town's faith in its customers and their transactions. Furthermore, for four months, bills were negotiated from Swartz and Cohen without incident. Town consistently acted in a commercially reasonable manner.

██ New England seems to make two distinct negligent misrepresentation arguments, per *Craig v. Everett Brooks Co.*, 351 Mass. 497, 222 N.E.2d 752 (1967). One argument suggests that Town made negligent misrepresentations as to its title in, and right to transfer the disputed securities.

Setting aside the question of whether such representations were actually made, it is sufficient to answer that, as a bona fide purchaser, Town would not have been making misrepresentations if it had said that it had good title and a right to transfer. Mass.Gen.Laws ch. 106, § 8–301(2).[12]

A second negligent misrepresentation argument is made concerning non-disclosure of material circumstances connected with the transactions. To the extent that this claim is merely a restatement of earlier fraud allegations, the court has already disposed of that theory. To the extent that New England actually suggests that Town should have revealed all of the unusual circumstances surrounding those transactions, the court rejects such theory consistent with its previous findings and conclusions. Allegations as to Town's "willful, wanton and reckless disregard of the rights of and its duty toward New England" are rejected under the same rationale.

### III.

For all of the foregoing reasons, the court holds in favor of the third party defendant, Town Bank and Trust Co. An order will issue.

---

12. Furthermore, New England's argument really sounds in warranty and § 8–306(2) limits the scope of Town's warranties.