Glenn E. ROSENBERG, Andrea N. Rosenberg and NYBO, Inc., Plaintiffs,

v.

The PILLSBURY COMPANY, Haagen–Dazs, Inc., Haagen–Dazs Franchise, Inc., Woodbridge Sweets, Inc., The Haagen–Dazs Company, Inc., The Haagen–Dazs Shoppes, Inc., HDF Liquidating Corporation, Reuben Mattus, Rose Mattus, Doris Mattus Hurley and Kevin Hurley, Defendants.

No. 85 Civ. 10072 (WCC).

United States District Court, S.D. New York.

July 28, 1989.

---

Stanley Cembalest, New York City, for plaintiffs.

Lane & Mittendorf, Alan R. Wentzel, New York City, Briggs and Morgan, St. Paul, Minn., for defendants The Pillsbury Co., The Haagen–Dazs Co., Inc., and The Haagen–Dazs Shoppes, Inc.

Shea & Gould (Yee Wah Chin, of counsel), New York City, Maslon Edelman Borman & Brand (William Z. Pentelovitch, Wayne S. Moskowitz, of counsel), Minneapolis, Minn., for defendants, Haagen–Dazs, Inc., Haagen–Dazs Franchise, Inc., Woodbridge Sweets, Inc., HDF Liquidating Corp., Reuben Mattus, Rose Mattus, Doris Mattus Hurley and Kevin Hurley.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Plaintiffs in this diversity action are Glenn and Andrea Rosenberg, and NYBO, Inc. (collectively, "the Rosenbergs"). Defendants are The Pillsbury Company, Haagen–Dazs Company, Inc., The Haagen–Dazs Shoppes, Inc. (collectively, "the Pillsbury defendants"), Reuben and Rose Mattus, Doris Mattus Hurley, Kevin Hurley, Haagen–Dazs Franchise, Inc., HDF Liquidating Corporation,[1] and Woodbridge Sweets, Inc. (collectively, "the Mattus defendants"). Plaintiffs instituted this action alleging fraud, breach of fiduciary duty, breach of good faith, antitrust violations, and tortious interference with prospective customers.[2] The action is now before the Court on defendants' motion for summary judgment, pursuant to Rule 56, Fed.R. Civ.P. For the reasons set forth below, the Court grants summary judgment to both the Pillsbury defendants and the Mattus defendants, and the action is dismissed.

## BACKGROUND

Haagen–Dazs ice cream has been sold through delicatessens and small food stores in prepackaged pints since it was first marketed as a "superpremium" ice cream by defendant Reuben Mattus in the early 1960's. During the 1970's, Haagen–Dazs ice cream was widely distributed through supermarkets and convenience stores, and by 1980, sales increased to over 19 million prepackaged pints per year in the United States. Koppen Aff. at ¶¶ 7, Exh. B.

In 1976, defendant Doris Mattus Hurley, Reuben Mattus's daughter, opened the first Haagen–Dazs retail shop, selling ice cream hand-dipped from bulk containers in the form of cones, sundaes, and milkshakes. Between 1976 and 1978, additional retail shops were opened and, in 1978, defendant Haagen–Dazs Franchise, Inc. was

---

1. Although Haagen–Dazs Franchise, Inc., and HDF Liquidating Corporation are named as separate defendants, they are not separate entities. Haagen–Dazs Franchise, Inc., changed its name to HDF Liquidating Corporation in 1983. Mattus Defendants' Responses to plaintiffs' First Set of Interrogatories, at 5. Haagen–Dazs Franchise, Inc., and HDF Liquidating Corporation will hereinafter be referred to collectively as "HDF."

2. As a preliminary matter, the Court notes that many of the claims alleged in plaintiffs' amended complaint have previously been withdrawn with prejudice by stipulation. These include alleged improper site selection, and alleged misrepresentations about trade secrets, store design plans, and operating assistance under Counts I and II, and all antitrust claims under Count IV.

formed to franchise such shops nationwide. Doris Mattus Hurley Aff. at ¶¶ 3–6.

In September, 1980, plaintiffs Glenn and Andrea Rosenberg signed a franchise agreement for their first Haagen–Dazs ice cream shop (the "Charles Street Shop"), at the corner of Charles and Mount Vernon Streets in Boston, Massachusetts. The franchise agreement was eventually executed in June, 1981, and the Charles Street Shop opened the following August. Several months later, on November 30, 1981, plaintiffs executed a franchise agreement for a second Haagen–Dazs ice cream shop (the "Kenmore Square Shop"), at Boston's Kenmore Square, which was opened in April, 1982. Plaintiffs have continued to operate the Charles Street Shop, and it is not the subject of this litigation. However, plaintiffs closed the Kenmore Square Shop in 1985, and instituted this action thereafter.

## DISCUSSION

The gravamen of plaintiffs' claim is that defendants fraudulently induced them to enter into the franchise agreement for the Kenmore Square Shop by misrepresenting its profitability, and then siphoned potential customers away from the shop by pursuing widescale distribution of prepackaged pints to supermarkets and convenience stores. Specifically, the remaining claims at issue in this lawsuit are: fraud, breach of fiduciary duty, breach of duty of good faith, tortious interference with prospective customers, and breach of contract. I will address each in turn.

## I. Fraud

Under Counts I and II of the amended complaint, plaintiffs allege that they were fraudulently induced to enter into the franchise agreement for the Kenmore Square Shop because of their reliance on misrepresentations and nondisclosures by the Mattus defendants prior to the execution of the franchise agreement for the Charles Street Shop. They claim that:

1) they were told by a vice president of HDF, Carl Paley, who is not a defendant in this action, and by defendant Doris Mattus Hurley, the president of HDF, that the minimum gross revenues of any Haagen–Dazs franchise after the first year of business was $225,000, when in fact "The Haagen–Dazs Book of Ice Cream" stated that the figure was $150,000.

2) Paley wrote plaintiffs a letter stating that the average gross sales of Haagen–Dazs Shops was $220,000–260,000, and that the average *gross* pre-tax profit was 29–35%, after writing another franchisee nine months earlier that the average gross sales of Haagen–Dazs Shops was $200,000–250,000, and that the average *net* pre-tax profit was 20–30%.

3) defendants assured plaintiffs that a number of flavors of ice cream would be marketed exclusively through the franchised shops, but did not disclose that they planned to sell virtually every flavor in prepackaged pints through supermarkets and convenience stores.

4) defendants did not inform plaintiffs that they had not planned and were not prepared to implement a national advertising campaign.

5) an offering circular submitted by defendants to plaintiffs did not disclose that

a) Haagen–Dazs distributed prepackaged pints of ice cream to approximately 10,000 supermarkets and grocery stores.

b) ice cream bought in shops cost the consumer more than in supermarkets and convenience stores.

c) the "normal margin" for a franchise shop was 75%, compared with 30% for a supermarket.

d) only 12% of Haagen–Dazs ice cream was sold in franchised shops, with the remaining 88% sold in supermarkets and convenience stores.

e) defendants considered the distribution end of the business more important than the franchise end.

Plaintiffs claim that they were unaware of the facts allegedly concealed by defendants' non-disclosures until 1983, after both their shops were operating. Plaintiffs maintain that had they been apprised of the facts allegedly concealed by defendants,

they would not have signed the franchise agreement for the Kenmore Square Shop.

No fraud claim based upon these alleged misrepresentations and non-disclosures will lie against either the Pillsbury defendants or the Mattus defendants.

### A. *Choice of Law*

■ The franchise agreement provides that "any and all performance thereunder, or breach thereof shall be interpreted, governed and construed pursuant to the laws of the State of New York." Franchise Agreement at ¶ 28. While this provision is effective as to breach of contract claims, it does not apply to fraud claims, which sound in tort. *See Klock v. Lehman Bros. Kuhn Loeb, Inc.*, 584 F.Supp. 210, 215 (S.D.N.Y.1984) (under New York law, "A contractual choice of law provision governs only a cause of action sounding in contract").

■ Defendants assert, and plaintiffs do not contest, that Massachusetts law governs the substantive issue of fraudulent inducement. I agree. In a diversity case, the district court must look to the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York law requires its courts to employ "interest analysis" to determine which state's law governs a tort claim. *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 94, 480 N.E.2d 679, 683 (1985).

■ Interest analysis requires the application of the law of the jurisdiction having the greatest interest in the litigation, with the court considering only those contacts which are relevant in determining the state's interest. *Id.* 491 N.Y.S.2d at 95, 480 N.E.2d at 684. "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Id.; accord Boxer v. Gottlieb*, 652 F.Supp. 1056 (S.D.N.Y.1987); *O'Donnell v. NPS Corp.*, 133 A.D.2d 73, 518 N.Y.S.2d 418, 420 (2d Dep't 1987). Indeed, in applying New York's choice of law rules, federal district courts have continued

to emphasize the locus of the tort in determining which state's law applies. *Mikropul Corp. v. Desimone & Chaplin–Airtech, Inc.*, 599 F.Supp. 940 (S.D.N.Y.1984); *Kohn v. United States*, 591 F.Supp. 568 (E.D.N.Y.1984), *aff'd* 760 F.2d 253 (2d Cir. 1985); *Patton v. Carnrike*, 510 F.Supp. 625 (S.D.N.Y.1981). In the present matter, where plaintiffs are domiciled in Massachusetts, and defendants are domiciled in New Jersey, the locus of the alleged tort is paramount.

■ The locus of a fraud is "the place where the injury was inflicted," as opposed to the place where the fraudulent act originated. 19 N.Y.Jur.2d *Conflict of Laws* § 40 (1982). Judge Friendly has explained,

"[s]ince a tort action traditionally has not been viewed as complete until the plaintiff suffers injury or loss, the cause of action has been considered to arise at the place where this damage was sustained ... [c]learly a cause of action for fraud does not arise until loss is suffered; we have every reason to believe that the New York courts would therefore hold that the cause of action accrues *where* the loss is suffered."

*Sack v. Low*, 478 F.2d 360, 365–66 (2d Cir.1973). Thus, in ascertaining the locus of the alleged fraud in the case at bar, it is immaterial that the alleged misrepresentations occurred in New Jersey, or were transmitted from New Jersey to New York. The alleged injury suffered by plaintiffs occurred at their Kenmore Square Shop, in Massachusetts. Therefore, the locus of the fraud in this case is Massachusetts.

Since the locus of the alleged fraud was Massachusetts, and plaintiffs were domiciliaries of Massachusetts when they allegedly suffered injury at their Kenmore Square Shop, under New York's choice of law rules, plaintiff's fraud claims are controlled by Massachusetts law.

### B. *The Pillsbury Defendants*

■ With respect to the Pillsbury defendants, the fraud claim must be dismissed, because the alleged events upon which it is based pre-date their involvement with

plaintiffs. All of the alleged misrepresentations and nondisclosures listed above allegedly occurred before plaintiffs entered into the franchise agreement for the Kenmore Square Shop on November 30, 1981. At that time the Haagen–Dazs ice cream business and companies were owned and operated by the Mattus defendants. Pillsbury had no connection with Haagen–Dazs in 1981. It acquired its present interest in the business in July 1983, when it purchased the assets of the operating companies. Levin Aff. at ¶¶ 3–6. Thus, the Pillsbury defendants played no role in any of the alleged misrepresentations and nondisclosures identified by plaintiffs in the first two counts of the amended complaint.

"The general rule in the majority of American jurisdictions, including Massachusetts, is that 'a company which purchases the assets of another company is not liable for the debts and liabilities of the transferor.'" *Dayton v. Peck, Stow and Wilcox Co. (PEXTO)*, 739 F.2d 690, 692 (1st Cir.1984) (quoting *Araserv, Inc. v. Bay State Harness Horse Racing and Breeding Association, Inc.*, 437 F.Supp. 1083, 1089 (D.Mass.1977)); *accord Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 464 N.Y.S.2d 437, 440, 451 N.E.2d 195, 198 (1983). There are four well-recognized exceptions to this principle under which a corporation may be held liable for the torts of its predecessor:

> 1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; 2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; 3) when the purchaser corporation is merely a continuation of the seller corporation; or 4) the transaction is entered into fraudulently to escape liability for such obligations.

*Dayton*, 739 F.2d at 692 (citations omitted); *accord Schumacher*, 464 N.Y.S.2d at 440, 451 N.E.2d at 198. Summary judgment is appropriate where plaintiffs do not set forth facts bringing defendants within one of these exceptions. *Dayton*, 739 F.2d at 692.

None of these circumstances is present here, and plaintiffs do not maintain that any of them is. Indeed, plaintiffs expressly concede that its fraud claims are inapplicable to the Pillsbury defendants: "plaintiffs' causes of action which are based upon fraud and fraudulent concealment are applicable only" to the Mattus defendants. (Plaintiffs' Brief at 16). Furthermore, in his affidavit, plaintiff Glenn Rosenberg admits, "[w]e are not relying upon any assumption by Pillsbury of liabilities by the Mattus Corporations and the Mattus family...." (Glenn Rosenberg Aff. at ¶ 127). Consequently, the Pillsbury defendants are entitled to summary judgment on Counts I and II of plaintiffs' amended complaint, and plaintiffs' fraud claims are dismissed as against them.

### C. *The Mattus Defendants*
#### 1. Improper Defendants

The fraud claims must also be dismissed as against the Mattus defendants on a number of grounds. First, with respect to the claims based on fraudulent misrepresentation, the only persons identified by plaintiffs as having made any misrepresentations are Carl Paley and Doris Mattus Hurley, who were at the time officers of HDF. The fact that Reuben and Rose Mattus were also officers of HDF is not sufficient to hold them liable for the allegedly fraudulent conduct of HDF's agents. *See Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 907 (1st Cir.1980); *Lahr v. Adell Chem. Co.*, 300 F.2d 256, 260 (1st Cir.1962); *Refrigeration Discount Corp. v. Catino*, 330 Mass. 230, 112 N.E.2d 790 (1953). An officer of a corporation may only be held liable for the corporation's torts where the officer actively participated in the alleged tortious conduct. *Escude Cruz*, 619 F.2d at 907. Plaintiffs have offered no proof that Reuben or Rose Mattus participated in any way in making misrepresentations or withholding information they were obligated to provide to plaintiffs. Consequently, plaintiffs' claims relating to fraudulent misrepresentations and nondisclosures must be dismissed as against Reuben and Rose Mattus.

Second, Paley and defendant Doris Mattus Hurley are not officers or employees of Haagen–Dazs, Inc. ("HDI") or Woodbridge Sweets, Inc. ("WSI"), and plaintiffs do not allege that anyone affiliated with HDI or WSI made any misrepresentations or withheld information. Therefore, plaintiffs' claims of fraudulent misrepresentation and nondisclosure must be dismissed as against HDI and WSI. Nor have plaintiffs accused defendant Kevin Hurley of making any fraudulent misrepresentations. Therefore, those claims must also be dismissed as against him.

### 2. The Offering Circular and Franchise Agreement

#### a) *Alleged Misrepresentations*

■ The Mattus defendants argue that plaintiffs' remaining allegations of fraudulent misrepresentation and nondisclosure are precluded by the statute of limitations, or, alternatively, by the express disclaimers of the offering circular and franchise agreement. I need not determine whether plaintiffs' remaining fraud claims are barred by the statute of limitations, because I find that they are precluded by the language contained in the franchise agreement.

To make out a case for fraudulent misrepresentation under Massachusetts common law, plaintiffs must show:

that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.

*Danca v. Taunton Savings Bank,* 385 Mass. 1, 429 N.E.2d 1129, 1133 (1982) (citations omitted). Under this standard, plaintiffs' reliance must be reasonable. *See Saxon Theatre Corp. v. Sage,* 347 Mass. 662, 200 N.E.2d 241, 244–245 (1964); *see also Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 805 (1st Cir.1987) (fraud claim will not lie where reliance was not reasonable).

In the current matter, plaintiffs' alleged reliance on defendants' alleged misrepresentations was unreasonable as a matter of law, because the alleged misrepresentations were not contained in the franchise agreement. The franchise agreement, as well as the offering circular which preceded it, both contain detailed, explicit integration and disclaimer clauses. The franchise agreement states:

Franchisee agrees that no claims of success or failure have been made to him prior to signing this Franchise; and that he understands all the terms and conditions of this Franchise. This Franchise contains all oral and written agreements, representations and arrangements between the parties hereto, and any rights which the respective parties hereto may have had under any other previous contracts are hereby cancelled and terminated, and no representations or warranties are made or implied, except as specifically set forth herein. This Franchise cannot be changed or terminated orally.

Franchise Agreement at ¶ 33, Schroeger Aff. Exh. C.

Before executing either franchise agreement, plaintiffs received an offering circular. In his affidavit, plaintiff Glenn Rosenberg admits, "I reviewed the offering circular carefully and it constituted a major factor in the plaintiffs' decision to enter into a franchise agreement.... we relied on the provisions of the disclosure statement ... in making our determination to enter into said franchise agreement for the [Kenmore Square Shop]." Rosenberg Aff. at ¶¶ 9, 11. The offering circular contains the following cautionary language:

No representations or statements of actual, or average, or projected, or forecasted sales, profits or earnings, (nor representations of actual or average, or projected, or forecasted sales, profits or earnings) are made to franchisees with respect to Haagen–Dazs Shoppes. Neither franchisor's sales personnel nor any employee or officer of the franchisor is authorized to make any claims or statements as to the earnings, sales, or profits or prospects or chances of success that any franchisee can expect or that present or past franchisees have had. The franchisor specifically instructs its sales per-

sonnel, agents, employees and officers that they are not permitted to make such claims or statements as to the earnings, sales, or profits or the prospects or chances of success, nor are they authorized to represent or estimate dollar figures as to given Haagen–Dazs Shoppe operations. The franchisor recommends that applicants for Haagen–Dazs Franchises make their own investigation and determine whether or not the Shoppes are profitable. The franchisor will not be bound by allegations of any unauthorized representations as to earnings, sales, profits or prospects or chances of success. The franchisor recommends that each applicant for a Haagen–Dazs Franchise should consult with an attorney of their choosing and further be represented by legal counsel at the time of their contract closing.

Offering Circular at p. 14, ¶ 19, Schroeger Aff. Exh. C. The franchise agreement and offering circular make it clear that no representation made outside the franchise agreement shall be accorded any weight.

▮▮ Although Massachusetts courts have established that a party may not contract out of fraud in cases involving the use of *general* or *ambiguous* disclaimers and integration clauses, *see, e.g., Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551 (1941); *Connelly v. Fellsway Motor Mart, Inc.*, 270 Mass. 386, 170 N.E. 467 (1930), where a disclaimer or integration clause is specific and clear, communications outside the four corners of the contract may not provide the basis for a fraud claim.

The First Circuit has recognized that in determining how much weight to accord disclaimers, courts must strike a balance between the competing values of contractual certainty and protecting innocent parties from fraud. *Turner v. Johnson & Johnson*, 809 F.2d 90, 95–96 (1st Cir.1986) (applying Massachusetts law). Where a disclaimer is clear, its terms overcome any external communications between the parties:

> We have no doubt that the balance shifts when the party asserting fraud is not seeking to avoid an ambiguous or decep-

tive 'contractual device' but is trying to reverse the precise terms of an agreement ... a contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experienced, knowledgeable businesspeople—to pause. Moreover, if a jury is allowed to ignore contract provisions directly at odds with oral representations allegedly made during negotiations, the language of a contract simply would not matter anymore.... Thus, in weighing the competing interests, the Massachusetts Supreme Judicial Court undoubtedly would find that the threat to contractual certainty usually would outweigh the possible unjustice of denying a claim of fraud.

*Id.* at 96. In *Turner*, the court of appeals went even further, holding that in the case before it, where "the facts fall somewhere in between a flat contradiction and a vague general disclaimer," *id.*, "the Massachusetts Supreme Judicial Court would reject as a matter of law plaintiffs' fraud claim...." *Id.* at 97. The franchise agreement in the case at hand contains the kind of disclaimer which the First Circuit, applying Massachusetts law, held sufficient to defeat a fraudulent inducement claim in *Turner*. Consequently, plaintiffs' fraud claims must be rejected.

Faced with integration clauses and disclaimers substantially similar to the one in the franchise agreement signed by plaintiffs, courts in Massachusetts, in three recent cases involving franchise agreements, have each time dismissed fraud claims based on alleged misrepresentations not contained in the franchise agreement.

In the first case, *Curry v. Steve's Franchise Company*, 1985–1 Trade Cas. (CCH) ¶ 66,421, 1984 WL 1468 (D.Mass.1984), two franchisees of an ice cream chain sued the franchisor, alleging antitrust violations and common law fraud. The court dismissed the fraud claims after finding that they were contradicted by integration and disclaimer provisions nearly identical to the ones at issue in the case before me. The court found that the plaintiffs' affidavit containing the allegations "does not pass

muster ... [i]t is partially based on hearsay, and violates the parol evidence rule by directly contradicting the explicit language of the executed documents."

Likewise, in *TLH International v. Au Bon Pain Franchising Corp.*, [1986–87 Transfer Binder] Bus. Franchise Guide (CCH) ¶ 8787, 1986 WL 13405 (D.Mass. Nov. 13, 1986), the court relied on a disclaimer in the franchise agreement to dismiss a franchisee's fraud claim. The court wrote:

> [T]he plaintiff may be choosing to ignore its own inability to correctly assess and carry out a business program and seeks to characterize its own shortcomings as a fraud perpetrated upon it by the defendants.... the plaintiff's complaint only reveals the failure of a risky business venture, one entered into by the plaintiff without any guarantees on the part of the defendants.

These cases were recently followed in *Symes v. Bahama Joe's, Inc.*, No. 87–0963–Z, 1988 WL 92462 (D.Mass. Aug. 12, 1988) (1988 U.S.Dist. LEXIS 9611), where the court again held that integration and disclaimer provisions bar fraud claims based on alleged misrepresentations not included in the franchise agreement.

*Symes* involved facts strikingly similar to the present case. The plaintiffs had purchased two Emack & Bolio's ice cream franchises, and they sued the franchisor corporation and its officers for allegedly inducing them through fraudulent misrepresentations and nondisclosures. Plaintiffs alleged that defendants had, among other things, "grossly inflated sales and returns in discussions prior to signing the agreements and grossly underestimated costs," and "did not disclose that they were planning to market prepackaged pints of Emack & Bolio's ice cream." *Id.* at 6.

The parties' agreements contained disclaimer and integration clauses materially indistinguishable from the ones here. Their agreements provided that they constituted the entire contract between the parties, that no prior representations had any

force and effect, and that no representation as to the potential success of the franchise was being made. *Id.* at 4–5. The court, citing *Steve's Franchise Company* and *Au Bon Pain*, held that these provisions barred plaintiffs' fraud claims and granted defendants summary judgment:

> "In this case, plaintiffs, assisted by counsel, signed three separate agreements in which they acknowledged the business risk, the fact that they had undertaken an independent investigation into Bahama Joe's operations and the fact that they did not rely on representations as to future profit ... [t]he specific disclaimers bar plaintiffs' claim of misrepresentation."

*Id.* at 12–13.

The circumstances in the case at bar are even more damning to plaintiffs than those in the cases discussed above, because in addition to being represented by counsel when they executed the franchise agreement,[3] plaintiffs had already been operating another Haagen–Dazs franchise shop for at least three months, and in fact still operate that shop on Charles Street in Boston. Because plaintiffs had the advantage of both prior experience in the business and proper representation before signing the second franchise agreement, and the franchise agreement and offering circular contained explicit disclaimers, their alleged reliance was unreasonable; their fraud claims fail as a matter of law. *See One–O–One Enterprises, Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C.Cir.1988) ("Were we to permit plaintiffs' use of the defendants' prior representations ... to defeat the clear words and purpose of the Final Agreement's integration clause, 'contracts would not be worth the paper on which they are written.'").

#### b) *Alleged Non–Disclosures*

■ Defendants' alleged nondisclosures are not actionable for fraud, either. The Supreme Court has recognized that

> At common law ... one who fails to disclose material information prior to the

---

**3.** In fact, plaintiff NYBO, Inc. is 90% owned by four partners of the New York law firm of Segan, Culhane, Nemerov, Singer and Geen. Pillsbury Defendants' Brief at 2.

consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' *Chiarella v. United States*, 445 U.S. 222, 227–28, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980). In their opposition brief, plaintiffs concede that "defendants did not have a fiduciary position to the plaintiffs." Defendants' Brief at 18. Nevertheless, defendants assert that "in essence" a fiduciary duty of disclosure was imposed on plaintiffs by N.Y.Gen.Bus.L. § 683 and unspecified "applicable Massachusetts law." Plaintiffs cite no authority for this proposition, and the Court is aware of none.[4]

It is clear that, under Massachusetts law, no fiduciary relationship existed between the parties in this case. The franchisor-franchisee relationship is an arms-length, commercial one, with the parties' relations governed by the terms of the offering circular and franchise agreement. *See Steve's Franchise Company* at ¶ 66,421 ("there is nothing in this case which suggests the existence of a fiduciary relationship, let alone the breach of fiduciary relationship"); *Au Bon Pain* at ¶ 8787 ("nothing ... suggests that a fiduciary relationship existed"); *Salinsky v. Perma Home Corp.*, 15 Mass.App. 193, 443 N.E.2d 1362, 1365 (1983) ("The concept of fiduciary relationship thus far does not seem to have been extended to purely commercial transactions."). Plaintiffs have presented no facts indicating that they enjoyed a special relationship of trust with defendants, nor that they were in an unconscionably weak position, and therefore they fall within the general rule articulated above.

Moreover, Massachusetts courts have held that "mere nondisclosure ... does not reach the watermark of fraud." *Nei v. Burley*, 388 Mass. 307, 446 N.E.2d 674, 676 (1983); *see also Turner v. Johnson & Johnson*, 809 F.2d 90, 100 (1st Cir.1986) (defendant's two alleged omissions cannot support fraud claim under rule of *Nei v.*

*Burley* that "a 'mere nondisclosure' is not actionable"). Plaintiffs have not alleged that defendants made incomplete or partial statements which deceived them, and therefore, in the absence of a fiduciary duty, defendants' omissions cannot provide the basis for a fraud claim. *Spencer Cos. v. Chase Manhattan Bank, N.A.*, 81 B.R. 194, 202 (D.Mass.1987) (dismissing fraud claim because defendant had no duty to disclose it would not provide interim financing); *Morgan Guaranty Trust Co. v. New England Merchants Nat'l Bank*, 438 F.Supp. 97 (D.Mass.1977) (dismissing deceit claim on ground that "the general rule in Massachusetts is that, absent a duty to speak, there can be no liability in deceit for failure to disclose"); *Swinton v. Whitinsville Savings Bank*, 311 Mass. 677, 42 N.E.2d 808, 808–09 (1942) (dismissing fraud action based on Massachusetts "rule of nonliability for bare nondisclosure").

## II. Breach of Fiduciary Duty

The preceding discussion establishes that no fiduciary relationship existed between plaintiffs and defendants. Therefore, this claim must be dismissed.

## III. Breach of Good Faith

Plaintiffs allege that by distributing prepackaged pints of ice cream to "an exploding number of supermarkets and convenience stores," Plaintiffs' Brief at 28–29, defendants "created a substantial conflict of interest," Plaintiffs' Brief at 13, and "drove the plaintiffs out of business," Plaintiffs' Brief at 28, thereby breaching a "contractual duty of good faith." Plaintiffs' Amended Complaint at ¶ 46. This claim sounds in contract, and under the terms of the franchise agreement, is therefore governed by New York law.

This claim fails, because plaintiffs have no evidence to support their assertions that there was "explosive growth" in the sale of prepackaged pints, Plaintiffs Brief at 14, that Pillsbury was "blanketing the country" with sales of prepackaged pints, *id.*, and that the market was "satu-

**4.** As I have already discussed, New York law is   inapplicable to the fraud claims in this action.

rated" with prepackaged pints. *Id.* at 15. These allegations are based solely on plaintiff Rosenberg's "information and belief." Rosenberg Aff. at ¶ 56. Rosenberg himself seems uncertain that any explosive growth took place at all. In paragraph 55 of his affidavit, he writes, *"[i]t appears* that after I entered into my franchise agreement with Haagen–Dazs for my store at 520 Commonwealth Avenue, Boston, Massachusetts ... there was explosive growth in the sale of the Haagen–Dazs prepackaged pints to supermarkets and convenience stores." Paragraph 56 then begins, "Although I do not have the exact dates during which this explosive growth took place, *on information and belief,* its most active period took place ... during the years 1983 and 1984." [5] In fact, it appears more likely that plaintiffs' Kenmore Square Shop failed, not because of competition from prepackaged pints, but because of the proliferation of competing ice cream shops in the same geographic area. Montes Aff. ¶ 6. Indeed, plaintiffs have acknowledged that "sales at [the Kenmore Square Shop] were halved and continued to decline" after a Steve's ice cream store opened nearby four months after their shop began operating. Plaintiffs' Answers to First Set of Interrogatories at 5.

Plaintiffs' bare assertions about an "explosion" in the sale of prepackaged pints, without more, cannot survive defendants' motion for summary judgment. "Those facts alleged on 'understanding' like those based on 'belief' or on 'information and belief', are not sufficient to create a genuine issue of fact." *Cermetek, Inc. v. Butler Avpak, Inc.,* 573 F.2d 1370, 1377 (9th Cir.1978); *accord Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir. 1988) ("Because there is no way to ascertain which portions of [the] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56."); *Orlik Ltd. v.*

*Helme Products Inc.,* 427 F.Supp. 771, 778 (S.D.N.Y.1977) ("[D]efendants' affidavit is submitted only upon information and belief. Thus, it fails to satisfy Rule 56(e) ... which requires affidavits to be made 'on personal knowledge.' "). Rule 56(e), Fed.R. Civ.P., states:

> Supporting and opposing affidavits shall be made on *personal knowledge,* shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein ... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Plaintiff Rosenberg's affidavit is couched in conclusory language, without any quantification of "saturation" or any proof that defendants flooded the market with prepackaged pints of ice cream, other than the fact that his Kenmore Square Shop was a failure. Affidavits which are "generalized, conclusory and unsubstantiated ... are insufficient to create a genuine factual dispute." *Citizens Environmental Council v. Volpe,* 484 F.2d 870, 873 (10th Cir.1973), *cert. denied, Citizens Environmental Council v. Brinegar,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). "Nor may a party rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Insurance Company,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

■ Even if plaintiff could show that there was explosive growth in the sale of prepackaged pints by defendants, this

---

**5.** The only evidence before the Court suggests that contrary to plaintiffs' unsubstantiated assertions, no "explosion" in the sale of pre-packaged pints ever took place while they operated their shoppes. 754,344 prepackaged pints of Haagen–Dazs ice cream were sold in the Boston area, and 19,491,704 pints were sold nationally, in the year *before* plaintiffs opened the Charles Street Shoppe. Koppen Aff. at ¶¶ 6–7. In addition, franchise sales of ice cream were never greater than 12% of all Haagen–Dazs sales. Doris Mattus Hurley Dep. at 58; Rosenberg Aff. at ¶ 13(d).

would nevertheless be insufficient to overcome defendants' motion for summary judgment. The franchise agreement explicitly reserves Haagen–Dazs' right to "distribute products identified by the Haagen–Dazs trademark through not only Haagen–Dazs Shoppes but through any other distribution method which may from time to time be established." Franchise Agreement at ¶ 4. This provision unambiguously allows Haagen–Dazs to distribute prepackaged pints of ice cream through supermarkets and convenience stores, especially in light of the fact that Haagen–Dazs historically distributed prepackaged pints long before the advent of franchise shops, a practice plaintiffs admit they were aware of before signing the franchise agreement.[6] "[W]here the expressed intention of contracting parties is clear, a contrary intent will not be created by implication." *Neuman v. Pike*, 591 F.2d 191, 194 (2d Cir. 1979) (applying New York law).

The only protection afforded plaintiffs by the franchise agreement sets geographical limits on the establishment of another Haagen–Dazs franchise shop within a certain distance from plaintiffs' shop. Franchise Agreement at ¶ 4. Plaintiff Rosenberg actually admits that "the franchise contracts did not limit or prevent the defendants herein from selling Haagen–Dazs ice cream in prepackaged pints to supermarkets and/or convenience stores ..." Rosenberg Aff. at ¶ 68. As a matter of law, the unambiguous terms of the franchise agreement bar plaintiffs' claim for breach of good faith.

Despite the clear provision in the franchise agreement, plaintiffs' cite *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980), as authority for the proposition that saturating the market with prepackaged pints of ice cream would be a breach of defendants' duty of good faith. Plaintiffs' reliance on *Photovest* is misplaced. In that case, the defendant franchisor opened its own stores to compete directly with the plaintiff franchisee, in order to "destroy plaintiff's business and to recover the franchise for itself." *Id.* at 728. Where, as in the case at bar, the franchisor distributes its product in a different manner aimed at a different market from its franchisees, and the franchisor's method of distribution simply continues a practice which existed long before franchises were created, the fact that the franchisor's distribution increases does not establish a breach of good faith.

Unlike the defendants' decision to open their own stores in *Photovest*, defendants' sale of prepackaged pints to supermarkets and convenience stores in this case does not place defendants in direct competition with plaintiffs, because prepackaged pints are sold in supermarkets primarily for home consumption, whereas the hand-dipped ice cream sold in franchise shops caters to individuals who are eating out. The case before the Court is further distinguishable from *Photovest*, because plaintiffs offer absolutely no reason why defendants would seek to undercut franchise shops, and in fact admit that Haagen–Dazs franchise shops serve as an effective marketing tool for prepackaged pints. Rosenberg Aff. at ¶¶ 59–61. Consequently, *Photovest* is not dispositive on the issue of good faith in the case at hand. Plaintiffs' claim for breach of good faith will not stand and must be dismissed.

## IV.  Tortious Interference

■ Plaintiffs allege that "the conduct, practices, and activities of the defendants ... constitute tortious interference with customers and/or prospective customers of plaintiffs ... [and] with the business of plaintiffs ..." Amended Complaint at ¶¶ 77–78. However, plaintiff Rosenberg admitted that he was aware of nothing defendants did to interfere with his customers "other than selling ice cream." Rosen- .

---

**6.**  Q  So before you opened the second store, you knew that pints were being sold in a lot of places?
A  Yes.

Q  And you knew that pints were being sold at prices that were below what you were charging in your Charles Street store?
A  I knew that, yes....
Rosenberg Dep. at 288–290.

berg Dep. at 700. Thus, the factual basis for these claims is identical to that for the breach of good faith claim, its essence being that defendants injured plaintiffs by selling prepackaged pints of ice cream to supermarkets and convenience stores. Plaintiffs offer no other evidence suggesting that defendants engaged in any activity interfering with customers or prospective customers.

Because it sounds in tort, and not contract, this count of plaintiffs' complaint is governed by Massachusetts law. To establish the tort of interference with contractual relations or prospective business relations in Massachusetts, plaintiffs must prove that defendants committed:

(1) intentional and wilful acts (2) calculated to cause damage to the plaintiffs in their lawful business, (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant, (which constitutes malice), and (4) actual damage and loss resulting.

*Chemawa Country Golf, Inc. v. Wnuk*, 9 Mass.App. 506, 402 N.E.2d 1069, 1072 (1980) (citations omitted). Plaintiffs have offered no evidence that defendants "calculated" to harm them by selling prepackaged pints of ice cream, and therefore fail to satisfy the second essential element of the tort. Moreover, I have held above that defendants abided by the terms of the franchise agreement in selling prepackaged pints to supermarkets and convenience stores. Therefore, as a matter of law, their acts were "done with right or justifiable cause," and plaintiffs cannot meet the third essential element of the tort. *Kazmaier v. Wooten*, 761 F.2d 46, 52 (1st Cir. 1985) (applying Massachusetts law); *Chemawa Country Golf*, 402 N.E.2d at 1072.

## V. Breach of Contract

Despite the fact that discovery has been completed, plaintiffs add a previously unasserted and unpleaded claim in their brief that "the Defendants breached their contract to market and advertise for the benefit of Plaintiffs." Plaintiffs' Brief at 29. Plaintiff Rosenberg claims that "defendants billed the plaintiffs and collected

from the plaintiffs the sum of $164.58 per month for marketing and advertising, but the defendants did not advertise or market for the benefit of the plaintiffs." Plaintiffs' Brief at 20; Rosenberg Aff. at ¶ 80. Yet at his deposition plaintiff Rosenberg testified that he never paid the marketing fee charged by defendants. Rosenberg Dep. at 678–79. In addition, he offers no documentary proof of his assertion. A party may not create a genuine issue of material fact by an affidavit contradicting his prior sworn deposition testimony. *Halloran v. Ohlmeyer Communications Co.*, 618 F.Supp. 1214, 1220–23 (S.D.N.Y.1985) (Conner, J.); *accord Whitfield v. Cohen*, 682 F.Supp. 188, 191 (S.D.N.Y.1988) (disregarding affidavit to the extent it was inconsistent with prior deposition testimony of affiant). The Second Circuit has explained the basis for this rule:

If a party who has been examined at length on

deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969); *accord Schwimmer v. Sony Corp. of America*, 637 F.2d 41, 45 (2d Cir.1980). Plaintiffs have made no attempt to explain why Rosenberg's affidavit directly contradicts his prior deposition testimony, nor have they offered evidence suggesting that his prior testimony should be disregarded. Therefore, in accordance with the law in this circuit, his affidavit must be ignored, he must be deemed not to have paid the marketing fee, and plaintiffs' tardy claim for breach of contract must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety, and plaintiffs' amended complaint is dismissed.