**LaGUARDIA ASSOCIATES, and Field Hotel Associates, Plaintiffs,**

v.

**HOLIDAY HOSPITALITY FRANCHISING, INC. Defendant.**

**No. CV 00–1436.**

United States District Court, E.D. New York.

April 6, 2000.

Lawrence G. McMichael, Patrick M. Northen, Dilworth Paxson LLP, Philadelphia, PA, James M. Felix, Kilhenny & Felix, New York, NY, for Plaintiffs.

Howard W. Burns, Jr., Burns Law Office, New York, NY, Ronald L. Reid, Alston & Bird LLP, Atlanta, GA, Charles W. Broun III, Bass Hotels & Resorts, Atlanta, GA, for Defendants.

*FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM, ORDER and JUDGMENT*

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I INTRODUCTION ................................................... 121
II FACTS .......................................................... 122
III FRANCHISE ARRANGEMENTS ........................................ 123
IV LAW ........................................................... 127
 A. Choice of Law .............................................. 127
 B. Injunction as an Equitable Remedy .......................... 128
 1. Success on the Merits .................................... 128
 a. Contract Modification ................................. 128
 b. Waiver ................................................ 129
 c. Equitable Considerations Limiting Power to Terminate and to Compel Strict Compliance with Fee Schedules ........................ 130
 2. Irreparable Harm ......................................... 130
V RELIEF ......................................................... 131
VI CONCLUSION .................................................... 131

## I INTRODUCTION

Plaintiffs, LaGuardia Associates ("LGA") and Field Hotel Associates ("FHA"), seek a permanent injunction against defendant Holiday Hospitality Franchising, Inc. ("Holiday") to forestall termination of two franchise agreements ("Agreements") between the parties. Relief is granted in part, for a limited duration. Defendant, as a matter of equity, may not now terminate the franchises, jeopardizing the operations of major hotels at New York's airports and putting at risk the jobs of over 400 employees.

## II FACTS

Plaintiffs are New York limited partnerships. They own and operate full service hotels ("Hotels") in the vicinity of the major New York City airports. LGA owns and operates the Crown Plaza Hotel at the LaGuardia Airport; FHA owns and operates the Holiday Inn Hotel at John F. Kennedy International Airport. Together, the hotels employ over 400 people in Queens County, New York.

Defendant is a Delaware corporation with its principal place of business in Atlanta, Georgia. It is a national franchisor which enters into licensing agreements with independently owned hotels throughout the world permitting those hotels to operate under the names "Holiday Inn" and "Crown Plaza."

In December 1990, plaintiffs and Holiday entered into two franchise agreements. Holiday granted plaintiffs authority to use Holiday's service marks, computerized reservation network ("Holidex"), and marketing programs. The Agreements were for a twenty year period, terminating in December 2010.

Pursuant to the terms of the Agreements, fees due Holiday for the franchises were to be calculated on a monthly basis, to be paid "by the 15th day of the following month." Agreements ¶ 6. Plaintiffs contend that this requirement was modified either orally or through a course of conduct, granting them an additional "60-day grace period" in which to pay Holiday.

The Agreements provide that Holiday may terminate the franchise relationships in case of default in payments under a complex notice and time sequence as follows:

> *Termination by Notice From Licensor.*
> In accordance with notice from Licensor to Licensee, the License will terminate (without any further notice unless required by law), provided that (i) the notice is mailed at least 30 days (or longer, if required by law) in advance of the termination date, (ii) the notice reasonably identifies one or more breaches of the Licensee's obligations, and (iii) the breach(es) are not fully remedied within the time period specified in the notice. If during the then preceding 12 months Licensee shall have engaged in a violation of this Agreement for which a notice of termination was given and termination failed to take effect because the default was remedied, the period given to remedy defaults will, if and to the extent permitted by law, be 10 days instead of 30.

Agreements ¶ 14(b). In addition to this general termination provision, the Agreements incorporate a shorter period for discontinuing availability of the Holidex reservation system:

> *Licensor's Responsibilities....* During the License Term, so long as the Licensee is in full compliance with its material obligations hereunder, Licensor will furnish Holidex reservation service to the Hotel .... Licensor shall give Licensee at least three days' advance notice before it terminates Holidex services to the Hotel.

Agreements ¶ 8.

A choice of law clause in the Agreements states that disputes arising from the interpretation or validity of the Agreement are to "be governed by Tennessee law." Agreements ¶ 17. Modifications or waivers of contractual terms must be in writing; any forebearance of Holiday does not preclude it from requiring strict compliance in the future:

> No change in this Agreement will be valid unless in writing signed by both parties. No failure to require strict performance or to exercise any right or remedy hereunder will preclude requiring strict performance or exercising any right or remedy in the future.

Agreements ¶ 17.

Despite the inflexible terms of the Agreements, the practice of Holiday was to allow a 60 day grace period beyond the payment schedule in the Agreements. In 1999, however, an executive at Holiday informed plaintiffs that "there is a new

sheriff in town," referring to new management personnel at Holiday.

On April 14, 1999, Holiday notified plaintiffs that they were in arrears for approximately $587,600 for the LaGuardia hotel and approximately $308,500 for the JFK hotel. Holiday also stated that termination of the franchises would occur on May 24, 1999 if all payments due as of May 19, 1999 were not timely made.

Plaintiffs made partial payments, but failed to fully cure their deficiency by the May 24th deadline. Despite the outstanding balance, Holiday did not terminate the Agreements. On August 2, 1999, it notified plaintiffs that it had "administratively extended the established termination date of the Agreement[s] from May 24, 1999 to August 11, 1999, in order to allow time for consideration by [Holiday's] Compliance Committee."

Holiday granted additional extensions, both expressly and implicitly until February 18, 2000. During this time plaintiffs made periodic partial payments, though they remained in arrears under the strict 15 day payment provisions of the Agreements.

On February 18, 2000, Holiday notified plaintiffs that they would be removed from the Holidex reservation system six days later, February 24, 2000. It also declared the franchise Agreements would "be referred to the [Holiday] Compliance Committee for consideration of termination of the Agreement[s]" if all fees then due were not paid in full by March 6, 2000. In addition, Holiday stated that future payments due under the Agreement[s] must be made "strictly in accordance with the terms of the Agreement[s] and by the 15th of the following month, as required in the Agreement[s]." Holiday included within the tally of amounts then due the January fees which, pursuant to the practice of allowing a 60–day grace period, would not have been considered by the plaintiffs as due until mid-April.

On February 24, the Hotels were removed from the Holidex reservation system. On February 25, plaintiffs made partial payment of the overdue sums and the Hotels were reinstated to Holidex on condition that plaintiffs "would agree to pay the remaining outstanding financial defaults by March 10, 2000, comply with their payment obligations under the License Agreements and sign a Special Letter Agreement" by March 8.

Instead of signing the Letter Agreement, plaintiffs filed a complaint in state court on March 8 seeking a temporary restraining order (TRO) prohibiting Holiday from removing plaintiffs from the Holidex reservation system. The TRO was granted.

Holiday then removed the case to federal court on March 14, with subject matter jurisdiction premised upon diversity. *See* 28 U.S.C. § 1332(a). On March 17, Holiday notified plaintiffs that the Agreements would be terminated effective March 22, 2000. A preliminary hearing was held in this court on March 21. On consent, the state court TRO ensuring plaintiffs' access to Holidex was extended until March 31 and expanded to prohibit Holiday from terminating the Agreements. As a condition for granting the extension, plaintiffs were ordered to immediately remit $500,000 by wire to Holiday and to post a bond of $500,000. In lieu of the bond, plaintiffs' wired $1,000,000 to satisfy the conditions imposed by the court. This payment effectively covered all sums then owed to Holiday pursuant to the fee schedules of the Agreements.

The parties agreed to forego a preliminary injunction hearing, and instead to proceed to a trial on the merits of a permanent injunction. The TRO was further extended to April 6 with the parties' consent.

A full evidentiary hearing has now been held. This memorandum includes the court's findings of fact and conclusions of law.

## III FRANCHISE ARRANGEMENTS

Franchising is a widely prevalent system of marketing and distribution. What is

often a small independent business (the franchisee) is granted, in return for a fee or other consideration, the right to market in the goods, services, or name brand of another (the franchisor) "in accordance with the established standards and practices of the franchisor, and with its assistance." David J. Kaufman, *An Introduction to Franchising and Franchise Law*, 603 Prac. L. Inst. 9, 9 (1992); *see* Gladys Glickman, 15 *Business Organizations: Franchising* § 2.02, at 2–2 (1996).

Franchise arrangements generally take one of two forms: "product and trade name" franchises or "business format" franchises. *See* Martin Edward Loeber, *A DTPA Cause of Action for the Terminated or Nonrenewed Franchisee: A Jack in the Box for the Unfair Franchisor*, 43 Baylor L.Rev. 809, 810–11 (1991) (citing Staff of House Comm. on Small Business, 101st Cong., *Franchising in the U.S. Economy: Prospects and Problems* 2 (1990)). In product and trade name franchises, the franchisee is granted a license to use the manufacturer's trademark in distributing the franchisor's products within a given geographical area. *See id.* (examples include "automobile dealerships, bottlers, and gasoline stations"). In contrast, business format franchises "usually couple the transfer of a trademark with a specific business format." *Id.* at 811 (examples include "convenience stores, fast food restaurants, hotels, and automobile service centers"). Holiday's franchises have characteristics of both categories.

The use of franchise agreements has increased markedly over the past several decades. *See* Scott Makar, *In Defense of Franchisors: The Law and Economics of Franchise Quality Assurance Mechanisms*, 33 Vill. L.Rev. 721, 722 (1988) ("In recent years, the franchise form of business has become an increasingly important and efficient means of producing and distributing products and services of uniform quality."). Prior to the 1950s, "manufacturers distributed their products by selling them to established wholesale and retail outlets or by relying upon their own distribution systems." Ernest Gelhorn, *Limita-tions on Contract Termination Rights— Franchise Cancellations*, 1967 Duke L.J. 465, 465 (1967).

With the advent of a national, and now global, economic system, these traditional methods of marketing have often proven less attractive both to entrepreneurs and consumers. Purchasers of products and services demand uniformity and consistency of service which often cannot be ensured by a traditional retail sales arrangement. As Mitchell J. Speiser, an analyst at Lehman Brothers in New York has noted with respect to one steakhouse franchise: "Customers don't want surprises. . . . They like knowing that a good dining experience . . . in New York assures them an equally good experience at other locations." Susan Konig, *A Fast–Food Strategy for a High–End Menu*, N.Y. Times, Sept. 20, 1998, at 14 (Long Island ed.). Moreover, the capital investment necessary to create an independent distribution and sales force, or to establish service locations on a national scale, limits the ability of even large multi-national corporations to mobilize sufficient resources for competition in a rapidly changing economic environment.

Franchise arrangements allow companies to minimize many management and financial problems. *See* Makar, *supra*, at 725 ("Franchisors generally cannot bear the financial burden of creating their own distribution systems but wish to maintain the greatest degree of control possible over their product's preparation and distribution."). A franchise relationship provides the franchisor with the ability to expand rapidly, penetrating new sales or service markets, without having to invest large amounts of its own capital. It also allows the franchisor to significantly control local outlets by insisting upon standards for training, marketing and servicing. Equally important, the franchise relationship allows the "franchisor [to] acquire[ ] the aggressive self-motivation of franchisees, whose ownership fervor is generally far greater

than that of employee managers." Kaufman, *supra*, at 21. Thus, the franchise relationship "permits the franchisor and the franchisee to combine the advantages of individual ownership with the efficiencies attending large-scale operations." *Hearings Before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary*, 89th Cong., pt. 1, at 8 (1965).

The hallmark of a franchise relationship is the exchange of "goodwill" between the parties. *See* Makar, *supra*, at 729 ("To a great degree, the franchisor-franchisee relationship is based on the benefits flowing from the mutual sharing of" consumer demand and goodwill for the franchised product or service.). Goodwill is an intangible asset representing the value of a business reputation or brand name which conveys quality and dependability among a group of established customers or the public at large. "It represents the ability of a company to generate earnings over and above the operating value of the company's other tangible and intangible assets." Benjamin A. Levin & Richard S. Morrison, *Who Owns Goodwill at the Franchised Location?*, 18 Franchise L.J. 85, 116 (1999). By authorizing the franchisee to use its trademarks and to sell its products or services, the franchisor is essentially lending its national goodwill to the franchisee. "[T]he franchisor's trademark induces the consuming public to expect from the franchisee a uniformly acceptable service or product endorsed by the franchisor itself." *Id.* The franchisee—by investing his or her time, effort and capital—generates local goodwill, further bolstering the reputation of the national product or service. *See id.* at 116–17 ("Customer goodwill is created at least in part through the personal relationships a business proprietor has with its customers and suppliers.").

Ideally, the mutual interest of both parties in maintaining local consumer satisfaction will ensure a fair and harmonious business relationship. Nevertheless, the unequal economic power between the parties—often a national or multi-national corporation against a local, small independent business—can hinder respect and fair treatment. *Cf. Ford Motor Co. v. United States*, 335 U.S. 303, 323, 69 S.Ct. 93, 93 L.Ed. 24 (1948) (Black, J., dissenting) (automobile dealers are "economic dependents of the company whose cars they sell").

The economic dominance of the franchisor may be brought to bear at the outset of the relationship to create a franchise contract that is unfair to the franchisee. *See Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 614 A.2d 124, 132 (1992) (marketplace fails to provide adequate protection to franchisees because they often have "substantially-inferior bargaining power"). Once the franchisee has invested time and resources in establishing a local market for the franchisor's goods or services, the franchisor can exercise its dominance by terminating the agreement either to open an outlet of its own or to create a new franchise relationship with a third party on more favorable terms to the franchisor. The franchisor is thus able to capitalize and exploit the local goodwill generated by the franchisee. By contrast, the franchisee—particularly where an exclusive dealing agreement is involved—is often left with no means to recoup its investment in promoting the franchisor's products or services in the local market.

A commentator's hypothetical illustrates the franchisee's dilemma:

Alice, a middle class high school graduate, has saved her money and would like to have a business of her own. She decides to buy a cinnamon roll franchise and operates it in the local shopping mall. Her franchise agreement provides that the franchisor may terminate the franchise agreement ... without cause. Alice invests large amounts of time and money into her business, and it shows in the profits. The ... franchisor, who has been monitoring Alice's profits, decides he wants the profits for himself [now that the reputation for the product has

been established locally]. The franchisor terminates the franchise agreement and then continues to operate the business himself. Alice has nothing to show for her hard work, and there is nothing she can do because the termination was lawful under the contract.

Tracey A. Nicastro, *How the Cookie Crumbles: The Good Cause Requirement for Terminating a Franchise Agreement*, 28 Val. U.L.Rev. 785, 787 (1994).

In order to equalize this potential power-imbalance and to protect local franchisees, a number of states have enacted franchise statutes. *See* Rose Marie Reynolds, *Good Cause for Franchise Termination: An Irreconcilable Difference Between Franchisee Fault and Franchisor Market Withdrawal*, 1992 B.Y.U. L.Rev. 785, 785–86 (1992) ("The application of common law contract doctrine to franchise agreements was modified during the 1970s as allegations of franchisor abuse reached legislators' receptive ears. Many states enacted legislation to correct the perceived disparity in bargaining power between franchisors and franchisees and to prevent unjust enrichment of the franchisor."); *see also* Bruce H. Kobayashi & Larry E. Ribstein, *Contract and Jurisdictional Freedom, in* F.H. Buckley, *The Fall and Rise of Freedom of Contract* 339–46 (1999) (franchisee protection statutes). These statutes generally protect only in-state franchisees. *See* Glickman, *supra,* § 2.02[4], at 2–46.

Although the specifics of these franchise statutes vary from state to state, they typically fall into one of two groups. *See* Jean Wegman Burns, *Vertical Restraints, Efficiency, and the Real World*, 62 Fordham L.Rev. 597, 619 (1993); Robert W. Emerson, *Franchising and the Collective Rights of Franchisees,* 43 Vand. L.Rev. 1503, 1509–11 (1990); Kaufman, *supra,* at 42.

The first category protects the francisee at the time of the purchase of the franchise. These laws generally require the disclosure of material information necessary for the franchisee to make an informed business decision. The New York Franchise Act is an example. *See, e.g.,* N.Y.Gen.Bus.Law § 680 *et seq.; id.* § 680(1) ("New York residents have suffered substantial losses where the franchisor or his representative has not provided full and complete information regarding the franchisor-franchisee relationship, the details of the contract between the franchisor and franchisee, the prior business experience of the franchisor, and other factors relevant to the franchise offered for sale."). State laws regulating only the formation of the franchise arrangement do not directly cover problems or disputes that can develop during the course of the franchise relationship. *See, e.g.,* Emerson, *supra,* at 1513.

A second category of state franchise laws operate to protect franchisees from arbitrary non-renewal or termination of the franchise. They require that franchisors establish "good cause" for non-renewal or termination of franchise agreements. Unlike its neighboring states of New Jersey and Connecticut, New York does not have a franchise statute that regulates the ongoing franchise relationship. *See, e.g.,* N.J.Stat.Ann. § 56:10–5 ("[I]t shall be a violation of this act for a franchisor to terminate, cancel, or fail to renew a franchise without good cause."); Conn.Gen. Stat.Ann. § 42–133f ("No franchisor shall, directly, or through any officer, agent or employee, terminate, cancel or fail to renew a franchise, except for good cause ....."); *cf.* Tenn.Code. Ann. § 47–25–103 ("[N]o franchisor·may terminate a franchise prior to the expiration of its terms, except for good cause asserted in good faith, nor may a franchisor terminate a franchise prior to expiration of its term without providing written notice of the facts and circumstances establishing good cause, and giving the franchisee a reasonable opportunity of at least (30) days to cure the alleged failure.").

■ Despite the fact that New York's statute does not by its express terms cover termination of franchises, its general tenor

bespeaks a state policy to prevent over-reaching in the franchise relationship.

## IV LAW

### A. Choice of Law

In a diversity action, a federal court will apply the choice of law rules of the forum state. *See* 28 U.S.C. § 1652; *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, New York's choice of law rules governs which state's substantive law controls here. *See Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648, 650 (2d Cir.1999).

■ New York's "rules require that determination of contract disputes be governed generally by the laws of the state with the most significant contacts to the contract." *Id.* (citing *In re Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993)). As an exception to this general rule, where, as here, the contract contains a choice of law clause, it is the general policy of New York to enforce the parties' choice. *See, e.g., Rosenberg v. Pillsbury Co.,* 718 F.Supp. 1146, 1150 (S.D.N.Y.1989) (enforcing choice of law clause in franchise agreement for contract disputes). New York courts will, however, decline to enforce a contractual choice of law selection if (1) the law of the state selected does not have a reasonable relationship to the economic activity, *see A. S. Rampell Inc. v. Hyster Co.,* 3 N.Y.2d 369, 381, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957), or (2) the state law chosen violates a fundamental public policy of New York, *see Cooney v. Osgood Mach. Inc.,* 81 N.Y.2d 66, 78–79, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993). *See, e.g., Superior Funding Corp. v. Big Apple Capital Corp.,* 738 F.Supp. 1468, 1471 (S.D.N.Y. 1990) ("In a diversity action, a court applying New York's choice of law rules will honor the parties' selection of the law that should govern the dispute when the law chosen has a *reasonable relationship to the agreement* and does not violate public policy." (emphasis added)); *Hunter v. H.D. Lee Co.,* 563 F.Supp. 1006, 1009 (S.D.N.Y. 1983) ("Under New York law, contracting parties may provide for the application of a particular state's law *as long as the contract bears a reasonable relationship to the state whose law is chosen* and the application of that law does not offend the fundamental public policy of New York." (emphasis added)).

■ The parties have failed to identify a sufficient "reasonable relationship" between the franchise and Tennessee to warrant application of the Agreements' Tennessee choice of law clauses. *See Finucane v. Interior Construction Corp.,* 264 A.D.2d 618, 695 N.Y.S.2d 322, 325 (1999) (contract carried out in New York, but plaintiff's principle place of business was in Oklahoma; "even if New York were deemed to have a greater interest in the litigation, the fact that [plaintiff's] principle place of business is located in Oklahoma is a sufficient basis to support enforcement of the parties' contractual choice of law"). Holiday is a Delaware chartered corporation with its principle place of business in Georgia. Plaintiffs are both New York limited partnerships with their principle places of business in New York. Holiday franchises a number of important hotels in New York apart from plaintiffs' hotels, and thus derives substantial continuing revenue from its New York operations.

*At the time the Agreements were entered into in 1990,* Holiday's headquarters was in Memphis, Tennessee. Since then Holiday has closed its corporate center in Tennessee and moved its headquarters to Atlanta, Georgia.

The fact that Tennessee *once* had a "reasonable relationship" to the Agreements is not sufficient to justify applying Tennessee law to the current dispute. The "reasonable relationship" of the chosen state to the agreement *must exist at the time of the contract dispute,* and not merely at some period in the past. At present, it cannot be said that Tennessee has any *interest in, or relationship to,* the Agreements or the franchise relationships they establish. The Tennessee choice of

law provision in the Agreements are thus unenforceable under New York choice of law rules.

This conclusion is buttressed by the fact that Holiday prepared the Agreements. It follows that Holiday, and not plaintiffs, affirmatively decided to impose its home state's law into any contract disputes. No unfair or unforeseen hardship is now worked on Holiday by declining to apply Tennessee law because Holiday, by authoring the choice of law clause in an effort to avail itself of the fruits of Tennessee law, but later removing its corporate operations from that state, *has through its own actions eliminated the necessary reasonable relationship between the franchise arrangements and Tennessee.*

New York law governs this dispute because "New York is the state most intimately concerned with the outcome," *Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co.,* 189 F.3d 208, 214 (2d Cir.1999), and because it has "the most significant contacts to the contract." *Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648, 650 (2d Cir.1999). The plaintiff-franchisees are both New York limited partnerships, the hotels are located in New York near the state's two major airports, and together, the hotels employee over 400 hundred persons in New York, most of whom are likely to be New York state residents.

## B. Injunction as an Equitable Remedy

An injunction "is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief." *Ticor Title Insurance Co. v. Cohen,* 173 F.3d 63, 68 (2d Cir.1999). To obtain injunctive relief, a party must succeed on the merits of its claim, as well as establish irreparable harm and inadequacy of legal remedies. *Id.; see New York State National Organization for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989); *see also Rodriguez v. DeBuono,* 175 F.3d 227, 235 n. 13 (2d Cir.1999) ("Although a showing of 'irreparable harm' is

required for the imposition of any injunctive relief, preliminary or permanent, the 'imminent' aspect of harm is not crucial to granting a permanent injunction." (internal citations omitted)).

### 1. Success on the Merits

In the absence of a New York statute specifically regulating ongoing franchise arrangements, general principles of the common law of contracts govern ongoing franchise relationships. *See, e.g., Rosenberg v. Pillsbury Co.,* 718 F.Supp. 1146, 1155 (S.D.N.Y.1989). Nevertheless, as already pointed out above, New York's policy requiring a reasonable balance of rights and obligations of franchisors and franchisees warrants application of equitable principles to the continuing relationship.

Plaintiffs state two bases for not allowing termination of the Agreements now. First, they contend the Agreements were modified either orally or through the parties' course-of-conduct to allow an additional 60–day grace period in paying fees beyond the time frame set out in the Agreements. Second, plaintiffs suggest that Holiday has waived its rights both to terminate the Agreements based on the April 1999 default and, by long-standing practice, to enforce strict compliance with the Agreements' provisions for payment of fees on the 15th day of the month following their accrual.

### a. Contract Modification

■ Plaintiffs' first contention that there was either an oral or course-of-conduct modification of the Agreements is without merit. The Agreements provide that they can be changed or modified only by a signed writing. "When a written contract provides that it can only be changed by a signed writing, an oral modification of that agreement ... is not enforceable." *Tierney v. Capricorn Investors, L.P.,* 189 A.D.2d 629, 592 N.Y.S.2d 700, 703 (1993); *see, e.g., Two Wall St. Assocs. Limited v. Anderson, Raymond & Lowenthal,* 183 A.D.2d 498, 583 N.Y.S.2d

436, 436 (1st Dept.1992) ("There was no written memorialization of this alleged modification of the lease, which by its terms barred any oral modification."); *Goodyear Pub'g Co. v. Mundell,* 75 A.D.2d 556, 427 N.Y.S.2d 242, 243 (1980) (supervening oral agreements would not alter parties' duties and responsibilities where original agreement expressly provided "this agreement may not be changed unless the parties to it agree in writing").

■ Plaintiffs proffer a letter from one of their own representatives which they argue supports their understanding that the 60–day grace period governed the franchises:

> Dear Bob: I received your notice yesterday and I spent time this morning with our [plaintiffs'] controller to see if we can embark on a payment schedule to achieve *your* [Holiday's] *goal of bringing our payments to within sixty days.*

Plfs' Ex. 6 (emphasis added) (Letter dated February 23, 2000, from Gary Isenberg to Robert Massery at Holiday). Plaintiffs contend that this letter, when considered with Holiday's failure to explicitly reject the 60–day grace period in a response letter, is sufficient to memorialize the modification.

This argument fails as a matter of law. New York requires that the modification not only be in writing, but that it *be signed by the party against whom enforcement is sought.* General Obligations Law § 15–301[1] ("A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."). Plaintiffs have failed to identify a writing signed by an agent of Holiday evidencing the alleged modification.

■ Plaintiffs' contention of an oral or course-of-conduct modification also fails as a matter of law from lack of consideration. *Cf.* N.Y. General Obligation Law § 5–1103

("An agreement, promise or undertaking to change or modify, or to discharge in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property, shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing, modifying, or discharging such contract, obligation, lease, mortgage or security interest, shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge, or by his agent."). Though defendant provided consideration by foregoing its right to payment on the 15th of the month following its accrual, plaintiffs neither undertook a new obligation nor gave up any right as consideration for a modification. *See Tierney,* 592 N.Y.S.2d at 703 ("Neither a promise to do that which the promisor is already bound to do, nor the performance of an existing legal obligation constitutes valid consideration [for a contract modification]."); *see, e.g., Taylor v. Blaylock & Partners, L.P.,* 240 A.D.2d 289, 659 N.Y.S.2d 257, 259 (1997); *Two Wall Street Assocs. Limited,* 583 N.Y.S.2d at 436; *Foley v. Pac Am or Bearing Inc.,* 105 A.D.2d 1120, 482 N.Y.S.2d 605, 605 (1984); *Federal Deposit Ins. Corp. v. Hyer,* 66 A.D.2d 521, 413 N.Y.S.2d 939, 944 (1979); *Mattlage Sales, Inc. v. Howard Johnson's Wholesale Div., Inc.,* 39 A.D.2d 958, 958–59, 333 N.Y.S.2d 491 (1972); *see generally* E. Allan Farnsworth, *Contracts* §§ 4.21–4.22, at 271 (1982) ("All that the contractor did in return for the new promise was to perform a duty that he owed under an existing contract, and *under the pre-existing duty rule, performance of a pre-existing duty is not consideration.*" (emphasis added)).

b. Waiver

■ Waiver is the voluntary abandonment of a known right which, but for the waiver, would have been enforceable. *Nassau Trust Co. v. Montrose Concrete Products Corp.,* 56 N.Y.2d 175, 451

N.Y.S.2d 663, 436 N.E.2d 1265, 1269–70 (1982) (Meyer, J.).

 Holiday, by not terminating on the April 1999 default for nearly ten months, but instead essentially abandoning that right until February 2000, waived its right to rely on that default—as it seeks to do—as a basis for termination of the Agreements. Holiday cannot now reach back to that default—and the notice of termination given at that time pursuant to the Agreements but not acted upon—to terminate the Agreements.

Holiday failed to give notice of termination as required by the Agreements for the subsequent defaults. Plaintiffs having essentially brought their payments current on those defaults, Holiday is now foreclosed from relying on those as a basis for termination in the absence of earlier notice of default on them.

### c. Equitable Considerations Limiting Power to Terminate and to Compel Strict Compliance with Fee Schedules

 Holiday's notice of termination in April 1999 was based in part on its unilateral revocation of its practice history of waiving the Agreements' requirement of payment of fees on the 15th day of the month following accrual. Through its course of conduct Holiday had repeatedly waived its right to payment on the 15th of each month and had instead allowed an additional 60–day grace period. Plaintiffs came to rely on this pattern of waiver and to build it into their own financial planning.

Holiday could not in April 1999 abruptly compel plaintiffs to comply with the strict payment terms in the Agreement without first providing sufficient notice of the withdrawal and a reasonable time for plaintiffs to alter their conduct. As the New York Court of Appeals has reasoned, "[a] waiver, to the extent that it has been executed, cannot be expunged or recalled, but, not being a binding agreement, can, to the extent that it is executory, be withdrawn, *provided the party whose performance has been waived is given notice of the with-*

*drawal and a reasonable time after notice within which to perform." Id.* at 1270, 451 N.Y.S.2d 663, 436 N.E.2d 1265 (emphasis added) (internal citations omitted); *cf. id.* at 1270–71, 451 N.Y.S.2d 663, 436 N.E.2d 1265 ("[T]he Imperato affidavit sets forth unrefuted facts from which, notwithstanding Montrose's admitted delinquencies, *a waiver of the right to declare a default and foreclose may be found* ... [as well as] *reliance, justifiable by reason of the past history of extension,* by Montrose to its detriment in that it continued to negotiate with Imperia rather than to seek other ways out of its dilemma only to have Imperia withdraw from those negotiations when foreclosure was instituted without notice or any reasonable opportunity to cure its defaults ....").

Having permitted plaintiffs to become addicted to payment delays, Holiday could not simply cut them off cold turkey. Few businesses which are not cash rich can withstand the elimination of a 60 day grace period for large fees without some time for financial readjustment.

A reasonable time for returning to strict compliance with the payment terms in the Agreements is required as a matter of equity. As Judge Bernard Meyer recognized in *Nassau Trust Co.,* New York recognizes these fundamentals of sensible business practice and incorporates them into its equitable doctrines. *Id.* (citing cases).

### 2. Irreparable Harm

 To establish irreparable harm a party must demonstrate that, but for the grant of equitable relief, there is a substantial likelihood that the party will suffer an injury "for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 37 (2d Cir.1995) (internal quotations omitted). The key inquiry is whether the potential injury is capable of being fully remedied by money damages. *See Doe v. Pataki,* 919 F.Supp. 691, 698 (S.D.N.Y.1996).

■ Irreparable harm can generally be assumed where a franchisor is attempting to terminate an exclusive franchise arrangement on short notice. By the nature of the exclusive arrangement, the franchisee's business operation depends upon the economic relationship established by the franchise agreement. The franchise relationship is the lifeline of the franchisee's business; the franchisee's investment of capital, time, and effort in promoting the franchisor's goods or services—to the general exclusion of competing goods and services—would be irreparably lost upon termination. Money damages cannot make the franchisee in such situations whole. *See Roso–Lino Beverage Distribs., Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124, 125–26 (2d Cir.1984) (per curiam) ("The loss of Roso–Lino's distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent money damages.").

■ Plaintiffs have made a credible showing that if Holiday were to terminate the Agreements the financial consequences to them would be devastating. Plaintiffs are able to charge a premium as a "known quantity"—a member of a quality hotel chain recognized world round—to travelers. They are also able to rely on the Holiday franchising network to gain reservations of travelers who might not otherwise learn of plaintiffs' Hotels. Without these benefits, plaintiffs would suffer a substantial revenue drop until new franchise relationships could be established, likely resulting in layoffs of experienced personnel, default on outstanding debts, and even potential bankruptcy. *See Tom Doherty Assocs., Inc.,* 60 F.3d at 38 ("Where the loss of a product will cause the destruction of a business itself . . ., the availability of money damages may be a hollow promise and [injunctive relief] appropriate.").

By contrast, Holiday has failed to present credible evidence that it would be ap-preciably harmed by the granting of injunctive relief. The assumption that a franchisee will suffer irreparable harm from the termination of the exclusive franchise relationships has not been overcome by Holiday.

## V RELIEF

Termination based on the April 1999 default is enjoined. Given that notice of termination was not provided for any subsequent defaults and that plaintiffs are now almost current in their payments, termination on those defaults is enjoined as well.

Payments for March 2000 must be made no later than May 1, 2000. All subsequent future payments must be made in strict accordance with the terms of the Agreements. For example, payments for April 2000 must be made on May 15, 2000. Failure to pay according to this schedule will constitute a default, allowing Holiday to take action to terminate the plaintiffs' franchise licenses as permitted under the Agreements.

All payments due from this date foreword are to be made by wire transfer. The wire transfer requirement, while not in the Agreements, is a reasonable *quid pro quo* for this injunction.

## VI CONCLUSION

Plaintiffs' motion for a permanent injunction to forestall termination of its franchises resulting from the April 1999 default or other past defaults is granted. Plaintiffs have until May 1, 2000 to pay fees due for March 2000. Plaintiffs have until May 15, 2000 to pay fees due for April 2000. Failure to comply may be treated by Holiday as a default, allowing commencement of the termination procedures as provided by the Agreements.

A more detailed form of injunction may be submitted to the court by the parties,

preferably after mutual agreement is reached on its express terms.

SO ORDERED.